IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANNETTE GOODMAN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-15-0627 |
| ARCHBISHOP CURLEY HIGH SCHOOL, INC. and | * | |
| ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Annette Goodman ("Plaintiff" or "Goodman") has brought this action against Defendants Archbishop Curley High School, Inc. ("Curley") and the Roman Catholic Archbishop of Baltimore ("Archdiocese") (collectively "Defendants"), alleging retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") and 34 C.F.R. § 100.7.  Currently pending before this Court is Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment (ECF No. 23).  The parties' submissions have been reviewed, and a hearing on the pending motion was held in this Court on February 5, 2016.  For the reasons stated herein, Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment (ECF No. 23) is DENIED.

## BACKGROUND

In ruling on a motion to dismiss, this Court accepts as true the facts alleged in the complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).  Plaintiff Annette

Goodman ("Plaintiff" or "Goodman") alleges the following:  In August of 2013, Goodman began working as a school librarian[1] at Defendant Archbishop Curley High School ("Curley"), an all-boys catholic high school administered by Defendant Roman Catholic Archbishop of Baltimore ("Archdiocese") (collectively "Defendants"). Compl. at ¶ 7, ECF No. 1.  In February of 2014, Goodman learned that Curley had recently disciplined a Curley teacher named Lynette Trotta ("Trotta") because of her inappropriate physical behavior with students.  *Id.* at ¶ 8.  Prior to that disciplinary action, Goodman claims, another Curley teacher named Friar Matthew Foley ("Foley") complained to Curley Vice Principal Brian Kohler ("Vice Principal Kohler") that he had observed inappropriate behavior between Trotta and a current Curley student (the "Student").  *Id.* at ¶ 9.

On March 6, 2014, a friend of the Student informed Goodman that the Student "did it" with Trotta in a car.  *Id.* at ¶ 10.  Goodman claims that Curley students often spread rumors of this nature.  *Id.*  Therefore, she initially dismissed the complaint as a rumor.  *Id.* However, on March 12, 2014, Goodman requested that the Student and his friend meet with her in a seminar room in the library.  *Id.* at ¶ 12.  Goodman asked the Student, "[A]re you in a relationship that is currently making you uncomfortable?"  *Id.*  The Student nodded yes. *Id.*  Goodman then asked, "Is this relationship with a member of the faculty?"  *Id.*  The Student again nodded yes, although he would not identify the faculty member by name.  *Id.*

On March 18, 2014, Goodman again spoke to the Student and his friend.  *Id.* at ¶ 13. This time, the Student revealed that Trotta had engaged in sexual activity with him, although he asked Goodman to keep his statement confidential.  *Id.*  By this point, Goodman

---

[1] Neither party has contended that Goodman's job duties were religious in nature.

suspected that Trotta's inappropriate behavior with the Student was more than just a rumor. *Id.* However, she feared how the Curley administration and Trotta's husband, a Curley math teacher, might react if she reported the Student's allegations. *Id.* at ¶ 14. Additionally, she was wary of breaking the Student's confidence and claims to have been unaware of the correct procedure for reporting such a serious allegation. *Id.* at ¶ 15.

Goodman claims that, on March 23, 2014, she decided to report the Student's allegations to the Curley administration. *Id.* at ¶ 16. However, when Goodman awoke on March 24th, she felt dizzy and weak. *Id.* at ¶ 17. She had suffered panic attacks in the past and planned to report to the administration as planned, but her symptoms only got worse after she arrived at school. The school nurse determined that Goodman was experiencing a hypertensive emergency, and Goodman went to the hospital. *Id.* Goodman remained in the hospital for two days, returning to school on March 30th, although her condition remained unstable and her blood pressure remained extremely elevated. *Id.* at ¶ 18.

On April 1, 2014, Goodman relayed to Vice Principal Kohler what the Student had told her about Trotta. *Id.* at ¶ 19. Vice Principal Kohler replied, "If I don't look surprised, it's because, well, I'm a professional and I've heard all of this before." *Id.* Additionally, he cautioned Plaintiff not to tell anyone else what she had disclosed to him and that he would figure out how to proceed. *Id.* Around noon on that same day, Vice Principal Kohler asked Goodman to relay the allegations to Principal Phil Piercy ("Principal Piercy"). *Id.* at ¶ 20. According to Goodman, Principal Piercy seemed unsure of the appropriate next steps but, like Vice Principal Kohler, told Plaintiff not to say anything. *Id.* Following that meeting, Principal Piercy reported the allegations to Father Joe Benicewicz ("Father Benicewicz"). *Id.*

3

at ¶ 21.   Later that afternoon, Goodman escorted her students to a school event where Father Benicewicz was present.   *Id.*   At that event, Goodman claims that Father Benicewicz ignored her attempts at an interaction and angrily glared at her.   *Id.* at ¶ 22.

On April 2, 2014, the Student informed Goodman that police had questioned him about his allegations against Trotta.   *Id.* at ¶ 23.   He said that he denied everything and had deleted everything related to Trotta from his phone.   *Id.*   Goodman told the Student that he should have been truthful with investigators.   *Id.*   Later that day, Goodman overheard several students discussing a rumor that Trotta had sex with the Student.   *Id.*   at ¶ 24. Goodman immediately informed Principal Piercy of her conversation with the Student and of what she had overheard.   *Id.* at ¶ 25.   Allegedly, Principal Piercy was unsure how to handle the situation, but told Goodman not to "say anything to anyone about anything."   *Id.*

Later that same day, Vice Principal Kohler informed Goodman that police detectives were on campus to begin investigating the Student's allegations.   *Id.* at ¶ 26.   Goodman posits that the police investigation attracted unwanted attention to Curley and the Archdiocese.   *Id.* at ¶¶ 27-28.   In fact, Father Benicewicz yelled at Goodman, "I am VERY, VERY upset with you!  Were you or were you not told not to speak to anybody?"   *Id.* at ¶ 29.   Goodman responded, "Yes, but the victim talked to me.  I didn't say anything."   *Id.* "Don't even go there!" Father Benicewicz replied.   *Id.*

It seemed to Goodman that the Curley administration had wanted to keep the allegations quiet.   *Id.* at ¶ 30.   After she left school on the afternoon of April 2, 2014, Goodman received a call requesting that she return to school to speak with detectives.   *Id.* at ¶ 31.  Two police detectives interviewed Goodman for nearly an hour in Principal Piercy's

office.  *Id.* at ¶ 32.  Goodman spent another hour answering questions from David Kinkopf, who introduced himself as counsel for Curley and the Archdiocese.  *Id.* at 33.  At the conclusion of the meeting, she was informed that she had broken Archdiocese policies, Canon law, and state law, and that she was suspended without pay.  *Id.* at 34.  Goodman claims that, prior to this meeting, neither Principal Piercy nor Vice Principal Kohler had mentioned any policies or procedures Goodman was required to follow after her report.  *Id.* Goodman alleges that the Defendants intended "to dissuade [her] from saying anything" about the allegations and "to retaliate against her for reporting the alleged sexual abuse."  *Id.* at ¶ 35.

On April 4, 2014, the Archdiocese issued a press statement, reporting that, "A number of weeks ago, Annette Goodman, the school's librarian, learned about the allegation [that Lynette Trotta had 'engaged in a sexual relationship with a current student during the current school year.']"  *Id.* at ¶ 36.  The statement continued, "Maryland law and the policies of the Archdiocese and Archbishop Curley High School require that allegations of child abuse be reported to civil authorities and to the head of the school as soon as possible.  Ms. Goodman reported the information to the school's administration on April 1."  *Id.*  The statement further disclosed that Curley had suspended Goodman.  *Id.* at ¶ 37.  Goodman alleges that the statement was intended to deflect responsibility for Defendants' deliberate indifference to sexual abuse onto Goodman and away from Defendants.  *Id.* at ¶ 38.

On April 10, 2014, Defendants terminated Goodman's employment.  *Id.* at ¶ 39.  The termination letter included an attached summary completed by the Director of Human Resources for the Parishes and Schools of the Archdiocese of Baltimore, stating that

Goodman was terminated for cause for (1) "failure to timely report information about possible sexual abuse of a student to appropriate authorities" and (2) "failure to comply with a directive not to discuss this matter pending investigation by law enforcement officials." The letter further stated that "[t]he reason for separation, as stated in this Summary, will be shared with potential employers." *Id.* at ¶ 40.

Plaintiff filed a complaint in this Court (ECF No. 1) claiming retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") and 34 C.F.R. § 100.7. Specifically, Goodman alleges that Trotta's sexual abuse of the Student and Curley's inadequate response violated Title IX, that Defendants had knowledge of Trotta's inappropriate behavior but, until her report, showed deliberate indifference, and that this deliberate indifference exposed Defendants to civil liability under Title IX. *Id.* at ¶¶ 41, 42-44, 45. Therefore, Goodman claims, Defendants retaliated against her after she reported Trotta's behavior by suspending her without pay, terminating her employment, informing her that they would share their reasons for termination with potential employers, publicly blaming her, and ruining her reputation. *Id.* at ¶ 46.

## **STANDARD OF REVIEW**

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests

surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678. First, while a court must accept as true all factual allegations contained in a complaint, legal conclusions are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

## ANALYSIS

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). In evaluating Title IX claims, the United States Court of Appeals for the Fourth Circuit looks to case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*, for guidance. *See Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that she engaged in a protected activity, (2) that her employer took "materially"

adverse action against her and (3) that a causal connection existed between the activity and the adverse action. *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 814 F. Supp. 2d 500, 514 (D. Md. 2011). Where, as here, the record contains no direct evidence of retaliation, a plaintiff's claims must be analyzed under the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, once a *prima facie* case of retaliation is established, the burden of production shifts to the defendant to offer a legitimate, non-retaliatory reason for its adverse employment action. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). If the employer fulfills this reciprocal duty, the burden reverts back to the plaintiff to establish that the defendant's proffered reason is pretextual and that her termination was in fact retaliatory. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

At a January 7, 2016 hearing on Defendants' first Motion to Dismiss (ECF No. 7), this Court ruled from the bench that Plaintiff stated a *prima facie* case of retaliation under Title IX and, therefore, denied Defendants' Motion via Order dated January 7, 2016 (ECF No. 21). However, Defendants have since filed a second Motion to Dismiss (ECF No. 23), arguing that Title IX's religious organizations exemption, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*[2], and the First Amendment to the United States Constitution bar Plaintiff's claim. Defendants proffer that Canon Law, in accordance with their own policies, "requires immediate reporting of child sex abuse" and that Goodman

---

[2] The Defendants, while citing RFRA, have not presented any argument to this Court with respect to that Act and have essentially based their arguments on the Title IX religious organizations exemption and the First Amendment. Accordingly, this Court briefly addresses RFRA at the conclusion of this opinion.

admittedly waited weeks[3] before reporting allegations of Trotta's sexual abuse of the Student, in clear violation of that rule. Defs.' Mem., p. 1-2, ECF No. 23-1.  Therefore, they argue, allowing Plaintiff's retaliation claim to proceed—"which seeks a finding that Title IX prohibited Goodman's termination and requires her reinstatement—would be inconsistent with [their] religious tenets" and would "unconstitutionally entangle the Court in [their] internal religious affairs."  *Id.* at 2.

Plaintiff responds that Title IX's religious organizations exemption, RFRA, and Defendant's First Amendment protections are not so broad as to preclude an otherwise well-pled claim of retaliation by a lay employee against a religious employer and that accepting Defendants' argument would run "contrary to the public policy underlying Title IX."  Pl.'s Opp'n, p. 1-2, ECF No. 24.  For the reasons stated herein, the Defendants' Motion to Dismiss (ECF No. 23) shall be DENIED, and this case will proceed with discovery in accordance with the *McDonnell Douglas* framework.  Specifically, Plaintiff will have the opportunity to obtain discovery from Defendants for the purpose of rebutting their non-retaliatory explanation for her termination.[4]  This process is not inconsistent with Defendants' religious tenet, nor does it violate the First Amendment or RFRA.

---

[3] Goodman alleges that the Student's best friend told her on March 6, 2014 that the Student had sex with Ms. Trotta, that she discussed the allegation with Student, who confirmed on March 12, 2014 that he was in a relationship with a teacher that was "currently making [him] feel uncomfortable," and that the Student implicated Trotta specifically on March 18, 2014, but that she did not inform Curley administrators of the suspected abuse until April 1, 2014.

[4] Plaintiff may demonstrate, for example, that Defendants' reporting rule has not been applied uniformly without challenging their religious beliefs.  *See DeMarco v. Holy Cross High School*, 4 F.3d 166, 170-171 (2d Cir. 1993).

I. **Title IX's Religious Organizations Exemption Does Not Preclude Plaintiff's Claim**

Title IX's religious organizations exemption provides that "this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). However, the Supreme Court of the United States in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) characterized the exceptions to Title IX's broad prohibition on discrimination as "narrow." *Jackson*, 544 U.S. at 173-175 ("Title IX, . . . subject to a list of *narrow* exceptions not at issue here, broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex' " . . . "Title IX is a broadly written general prohibition on discrimination, followed by specific, *narrow* exceptions to that broad prohibition"). Additionally, the United States Court of Appeals for the Sixth Circuit in *Doe v. Salvation Army in U.S.*, 685 F.3d 564 (6th Cir. 2012) specifically identified Title IX's religious organizations exemption as narrow. *See Doe*, 685 F.3d at 572 (referencing "*narrow* but express exceptions relating explicitly to religious organizations in the amendments to Title IX . . .") (emphasis added).

The Supreme Court in *Jackson* concluded that the ability to bring a retaliation claim is essential to Title IX's enforcement. *Jackson*, 544 U.S. at 180. The court observed the following:

> Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also "to provide individual citizens effective protection against those practices." [*Cannon v. Univ. of Chicago, et al.*, 441 U.S. 677, 704 (1979)]. We agree with the United States that this objective "would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation." Brief for United States as Amicus Curiae 13. If recipients were permitted to

retaliate freely, individuals who witness discrimination would be loath to report it, and all manner of Title IX violations might go unremedied as a result. *See* [*Sullivan v. Little Hunting Park, Inc., et al.*, 396 U.S. 229, 237 (1969)] (noting that without protection against retaliation, the underlying discrimination is perpetuated).

Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel. *Id.*

The position of the Defendants Archbishop Curley High School, Inc. and the Roman Catholic Archbishop of Baltimore is that Title IX's religious organizations exemption bars any employment discrimination or retaliation claim against them if they define their actions as tenets of their religion.  There is a noticeable lack of case authority supporting such a broad application of the religious exemption.  Few courts have addressed the breadth of Title IX's religious exemption and none have addressed it in the context of employment discrimination or retaliation claims.  However, several courts have considered the broader question of how far an employment discrimination claim may proceed in challenging an employer's religiously-based explanation for an adverse employment action without interfering with that employer's religious freedoms.  Those cases suggest that Title IX's "narrow" religious organizations exemption should not be read as supporting dismissal of Plaintiff's claim as a matter of law.

The United States Court of Appeals for the Fourth Circuit observed in *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) "that churches are not- and should not be-above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts. Their employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual

functions." *Rayburn*, 772 F.2d at 1171. Additionally, this Court in *Shirkey v. Eastwind Cmty. Dev. Corp.*, 941 F. Supp. 567 (D. Md. 1996) observed that "courts have found the employment decisions of religious institutions subject to scrutiny where those decisions involved neither the clergy-church relationship, nor the right which religious institutions have to discriminate in favor of members of their religious communities, nor religious doctrine." *Shirkey*, 941 F. Supp. at 577.

The Plaintiff in *DeMarco v. Holy Cross High School*, 4 F.3d 166 (2d Cir. 1993) brought an age discrimination claim under the Age Discrimination in Employment Act against his former employer, a Catholic parochial school. *DeMarco*, 7 F.3d at 168. The Defendant school objected "that DeMarco was dismissed for reasons unrelated to his age, including failure to begin his classes with prayer and failure to attend Mass with his students." *Id.* Like Defendants in this case, DeMarco's employer contended "that the district court should not reach the merits of DeMarco's age discrimination claims because, as a religious institution, it was statutorily exempt from the ADEA's anti-discrimination provisions." *Id.* The United States Court of Appeals for the Second Circuit rejected this argument, and allowed the claim to proceed in accordance with the *McDonnell Douglas* burden-shifting scheme. *Id.* at 170.

The Second Circuit concluded that applying the *McDonnell Douglas* burden-shifting analysis, as required in most employment discrimination actions, would not give rise to establishment clause concerns. *Id.* "[I]n applying the *McDonnell Douglas* test to determine whether an employer's putative purpose is a pretext," the Court reasoned, "a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated

purpose is the actual purpose for the challenged employment-related action." *Id.* at 170-171. The Court observed that "[t]he pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." *Id.* The Court concluded that "in those cases where a defendant proffers a religious purpose for its allegedly discriminatory employment action, a plaintiff will usually be able to challenge as pretextual the employer's justification without calling into question the value or truthfulness of religious doctrine." *Id.*

In a similar case, *Redhead v. Conference of Seventh-day Adventists*, 566 F. Supp. 2d 125 (E.D.N.Y. 2008) a teacher brought a Title VII action against her former employer, a religious school, for allegedly terminating her employment because she was pregnant and unmarried. *Redhead*, 566 F. Supp. 2d at 127. Like Defendants in this case, the school argued "that Title VII plaintiffs cannot challenge as 'pretextual' under *McDonnell Douglas* a religious employer's decision to discharge an employee if the employer justifies that decision on religious grounds." *Id.* at 131. The Court rejected the Defendant's argument, citing the Second Circuit's holding in *DeMarco* "that application of the *McDonnell Douglas* test to a discrimination claim brought by a lay employee against a religious employer, without more, generally does not run the risk of excessive entanglement, as such an inquiry constitutes only the sort of 'routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no 'detailed monitoring and close administrative contact' between secular and religious bodies.' " *Id.* at 133 (quoting *DeMarco*, 4

13

F.3d at 170).  The Court recognized that "[w]hen a Title VII case is brought against a religious organization . . . neither the court, nor the jury, may question the sincerity of a defendant's belief in a proffered religious justification . . ."  *Id.* at 134.  However, "an employer's simple assertion of a religious motive usually will not prevent a reviewing court from asking whether that motive 'was in fact pretext' within the meaning of *McDonnell Douglas.*"  *Id.* at 134 (quoting *DeMarco*, 4 F.3d at 171).

Allowing Plaintiff to challenge Defendants' religiously motivated explanation for her termination under the *McDonnell Douglas* burden-shifting analysis is not inconsistent with Defendants' religious tenets.  The United States Supreme Court has recognized the importance of retaliation claims in Title IX enforcement, *Jackson*, 544 U.S. at 180, and no court has since held that Title IX's religious organizations exemption precludes a Plaintiff from raising a Title IX retaliation claim simply because the employer has proposed a religious reason for her termination.  On the contrary, courts have recognized that simply allowing an employment discrimination or retaliation claim to proceed under the *McDonnell Douglas* scheme does not threaten a Defendant's religious interests or freedoms.  *See DeMarco*, 7 F.3d at 170-171 ("[I]n those cases where a defendant proffers a religious purpose for its allegedly discriminatory employment action, a plaintiff will usually be able to challenge as pretextual the employer's justification . . . ."); *Redhead*, 566 F. Supp. 2d at 134 ("an employer's simple assertion of a religious motive usually will not prevent a reviewing court from asking whether that motive 'was in fact pretext' within the meaning of *McDonnell Douglas.*" (quoting

*DeMarco*, 4 F.3d at 171)).  Therefore, Title IX's religious organizations exemption does not

bar Plaintiff's claim, and this case will proceed under the *McDonnell Douglas* framework.[5]

## II.    Allowing Plaintiff's Claim to Proceed Will Not Violate Defendants' First Amendment Freedoms

Defendants cite several United States Supreme Court cases for the general

proposition that the First Amendment prohibits courts from interfering with the internal

decisions of religious organizations.  *See, e.g., N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S.

490, 501 (1979); *Lemon v. Kurtzman*, 403 U.S. 602, 616-21 (1971).  This proposition cannot be

disputed.  In *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795 (4th Cir. 2000),

the United States Court of Appeals for the Fourth Circuit explained the following:

> The Supreme Court has always safeguarded the "unquestioned" prerogative of
> religious organizations to tend to "the ecclesiastical government of all the
> individual members, congregations, and officers within the general
> association." *Watson v. Jones*, 80 U.S. 679, 728-29 (1871); *see also Gonzalez v.
> Roman Catholic Archbishop of Manila*, 280 U.S. 1 (1929). For "religious freedom
> encompasses the 'power [of religious bodies] to decide for themselves, free
> from state interference, matters of church government as well as those of faith
> and doctrine.' " *Serbian Eastern Orthodox Diocese for the United States of America
> and Canada v. Milivojevich*, 426 U.S. 696, 721-22 (1976) (alteration in original)

---

[5] The United States Supreme Court has accepted Defendants' position with respect to the *ministerial*
exception, a First Amendment protection applicable to "the employment relationship between a religious
institution and its ministers."  *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694,
697 (2012) (emphasis added).  The Supreme Court held in *Hosanna-Tabor* that a minister may not bring an
employment discrimination suit challenging her church's decision to fire her and rejected the Plaintiff's
attempt to argue that her church's religious reason for her termination was pretextual.  *Hosanna-Tabor*, 132 S.
Ct. at 710 ("The EEOC and Perich suggest that Hosanna–Tabor's asserted religious reason for firing
Perich—that she violated the Synod's commitment to internal dispute resolution—was pretextual. That
suggestion misses the point of the ministerial exception. The purpose of the exception is not to safeguard a
church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures
that the authority to select and control who will minister to the faithful—a matter "strictly ecclesiastical,"
[*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)]—is the church's
alone).  There is absolutely no suggestion in this case that the *ministerial* exception applies as the Plaintiff was
employed as a school librarian, and her job position did not include any religious function.  Therefore, neither
the *ministerial* exception nor the Supreme Court's holding in *Hosanna-Tabor* are implicated in any way in this
case.

(quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government...." *Serbian Eastern Orthodox Diocese*, 426 U.S. at 724.

*Roman Catholic Diocese of Raleigh*, 213 F.3d at 800-801.

However, none of the cases cited by Defendants state that the First Amendment prohibits a retaliation claim against a religious employer from proceeding under the *McDonnell Douglas* burden-shifting analysis simply because an employer proffers that Plaintiff violated one of its religious tenets. On the contrary, courts have long-recognized that First Amendment protections do not unquestionably foreclose antidiscrimination actions, especially where a Plaintiff's job duties are not religious in nature, as is the case here. "Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." *Roman Catholic Diocese of Raleigh,* 213 F.3d at 801. "The shield which the First Amendment provides for religious institutions in their dealings with their clergy, does not, however extend to a blanket exemption from discrimination laws. 'The magnitude of the free exercise burden need not always obscure the magnitude of the state's interest embodied in Title VII.'" *Shirkey*, 941 F. Supp. at 577 (citing *Rayburn*, 772 F.2d at 1169).

Defendants contend that forcing them "to employ and reward someone whose admitted conduct violates [their] religious tenets unquestionably tramples [their] basic religious freedoms." Def.'s Mem., p. 17, ECF No. 23-1 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972); *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). However, neither of the cases they cite in support of their argument involved employment discrimination or retaliation claims and neither of them support Defendants' contention that

simply allowing a retaliation claim to proceed under the *McDonnell Douglas* burden-shifting analysis forces an employer to violate its religious beliefs.

On the contrary, the Second Circuit concluded in *Demarco* that the *McDonnell Douglas* analysis would not give rise to establishment clause concerns because "in applying the *McDonnell Douglas* test to determine whether an employer's putative purpose is a pretext, a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." *Demarco*, 4 F.3d at 170-171.  The Second Circuit in *DeMarco* observed that "[t]he pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." *Id.*

Additionally, the United States District Court for the Eastern District of New York concluded in *Redhead* "that application of the *McDonnell Douglas* test to a discrimination claim brought by a lay employee against a religious employer, without more, generally does not run the risk of excessive entanglement [between state interests and religion], as such an inquiry constitutes only the sort of 'routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no 'detailed monitoring and close administrative contact' between secular and religious bodies.' " *Id.* at 133 (quoting *DeMarco*, 4 F.3d at 170).  While the First Amendment does prohibit a Court from "question[ing] the sincerity of a defendant's belief in a proffered religious justification,"

17

an employer's assertion of a religious motive does not prevent a court from asking whether that motive was in fact a pretext under *McDonnell Douglas*. *Id.* at 134. For these reasons, allowing Plaintiff's claim to proceed under the *McDonnell Douglas* framework does not violate Defendants' First Amendment protections.

## III.   The Religious Freedom Restoration Act Does Not Preclude Plaintiff's Claim

The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.,* prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2754 (2014). The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") amended RFRA to cover "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Hobby Lobby*, 134 S. Ct. at 2754; § 2000cc–5(7)(A).

Defendants cite RFRA as grounds for granting their Motion, but mention it only briefly in a footnote in their Memorandum in support of their Motion and again in a footnote in their Reply brief. They rely mainly on the plain meaning of Title IX's religious organizations exemption, stating only that RFRA "would prohibit the application of Title IX in this instance because it imposes a substantial burden on Defendants' religious exercise." Defs' Mem., p. 18, n. 3, ECF No. 23-1.

There is limited Fourth Circuit precedent on RFRA.  In fact, the United States Courts of Appeals have split on the question of whether RFRA applies in a suit between two private parties, and the Fourth Circuit has not addressed this issue.  *See, e.g., Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) (RFRA is available as a defense to a private plaintiff's claim under the ADEA); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (RFRA is applicable only to suits to which the government is a party).  For the reasons discussed *supra*, there is no basis to dismiss this case under the Religious Freedom Restoration Act. Accordingly, Defendants' Motion to Dismiss (ECF No. 23) is DENIED.[6]

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 23) is DENIED.

A separate Order follows.

Dated: February 26th, 2016                      _____/s/_____

                                                Richard D. Bennett
                                                United States District Judge

---

[6] A district court will grant summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court will not convert the pending Motion to a Motion for Summary Judgment because Plaintiff "has not had the opportunity to discover information essential to [her] opposition." *See Works v. Colvin*, 519 Fed. Appx. 176, at 181 (4th Cir. 2013) (citing Fed. R. Civ. P. 56(d)). "[S]ummary judgment is appropriate only after adequate time for discovery." *Id.* (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). Through discovery, Plaintiff may uncover evidence that creates a genuine dispute as to whether Defendants' non-retaliatory explanation for her termination is a pretext, *e.g.*, that Defendants' mandatory reporting requirement was not uniformly enforced.